UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA

In re:

331 P<span style="font-variant:small-caps">ARTNERS</span>, LLC,                      Case No.: 10-00846-MAM

   *Debtor*.

**ORDER SUSTAINING OBJECTION TO CLAIM**

   Michael P. Brundage, Attorney for the Daakes, Tampa, FL
   A. Richard Maples, Attorney for the Debtor, Mobile, AL

This matter is before the Court on the Debtor's Objection to Claim #41 made by Thomas and Adele Daake. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(1), and the Court has authority to enter a final order. For the following reasons, the Objection to Claim is due to be SUSTAINED.

FACTS

331 Partners is an Alabama corporation formed by Bill Clay on June 14, 2004, for the purpose of acquiring Sandestin parcel number 331 in Sandestin, Florida. Parcel 331 was the only remaining tract of undeveloped single-family use property in the Sandestin resort. On June 15, 2004, 331 Partners signed a contract with Intrawest, developer of Sandestin resort, providing for the purchase of parcel 331 for $13,945,100.00. On June 24, 2004, IPC Industries acquired a two-thirds ownership interest in 331 Partners and Bill Clay retained a one-third ownership interest. Initially, both Bill Clay and IPC were managers of 331 Partners.

After acquiring the parcel, 331 Partners drafted agreements with Boardwalk at Baytowne, LLC, which called for Clay and IPC to transfer their interests in 331 Partners to Boardwalk at Baytowne and serve as its managers. Local home builder C-D Jones, owned by Dennis, Cynthia,

1

and Chris Jones, would be responsible under the draft agreements for building homes, supervising infrastructure, obtaining permits, providing home warranties, and managing construction budgets. In exchange, C-D Jones was to receive twenty-five percent of profits after repayment of capital contributions and loans. The arrangement between 331 Partners, Boardwalk at Baytowne, and C-D Jones fell through and the draft agreements were never executed.

On its 2004 tax returns, 331 Partners listed the value of parcel 331 as $14,112,711.00. On July 20, 2005, C-D Jones executed a Real Estate Sales Contract with 331 Partners to purchase parcel 331 for the purpose of developing the property. On November 3, 2005, C-D Jones and 331 Partners amended that contract. Under the amended contract the purchase price of the property was $49,915,857.00 of which $17,800,000.00 was to be paid in cash, $16,759,475.00 was financed under a "Lot Sales Note" (maturity date of December 31, 2006), and $15,356,382.00 was financed under a "Houses Note" (maturity date of December 31, 2009). Upon executing the amended contract on November 3, 2005, 331 Partners conveyed the property to C-D Jones.

The sales price of parcel 331 on November 3, 2005, was substantially higher than what 331 Partners determined the property was worth at the time it completed its 2004 tax returns. 331 Partners member McGowin Patrick testified that the large increase between when the 2004 taxes were completed and when the amended contract was entered on November 3, 2005, reflected improvements in the Florida real estate market during that time period (the Panhandle experienced a short period of marked improvement a few months after Hurricane Katrina had passed in August of 2005) and reflected the demand for the last remaining property inside the Sandestin Resort Community. He stated that further evidence supporting the increased value of

parcel 331 could be found in appraisals done in connection with refinancing the Whitney Bank note which was executed on December 4, 2004. Appraisals preceding the refinancing value the parcel at approximately $28,000,000.00 – meaning the value of the property doubled in a matter of months soon after 331 Partners acquired it.

Under the November 3, 2005, Lot Sales Note, payments were due upon the sale of any lot in the subdivision equal to the greater of 80.25% of the gross sales price or the applicable minimum release price, and interest was due upon the sales of lots computed based on the outstanding principal balance. The Lot Sales Note was secured by a first mortgage on all unsold lots. Under the Houses Note, principal payments were due upon the receipt of any construction proceeds in the amount of 25.20% of the gross construction proceeds and interest was to be paid quarterly in arrears computed on the then outstanding principal balance. The Houses Note was secured by a collateral assignment of all building contracts between C-D Jones and the lot buyers.

On November 3, 2005, 331 Partners and C-D Jones also executed an Assignment of Purchase Documents setting forth their agreement as to representations and warranties, covenants and further assurances, event of default and remedies, expenses, notices, successors and assigns, changes in writing, governing law, and counterparts/integration. Schedule II of that document, the Minimum Release Payments schedule, listed sixty-five lots to be sold by C-D Jones to various buyers in closings that occurred contemporaneously with the execution of the Assignment of Purchase Documents. The minimum release schedule prices for the lots range from $239,948.00 to $300,938.00. Between the November 3, 2005, closing and March 2007, C-D Jones sold twenty-seven more lots in what ultimately became the Villa Lago development. There were forty-four remaining unsold lots as of March 2007.

3

In May 2006, Dennis and Cynthia Jones sought to sell their interest in C-D Jones. Bill Clay purchased a 50% interest in the company with Chris Jones owning the remaining 50%. Since Bill Clay was also a member of 331 Partners, IPC amended the operating agreement of 331 Partners to remove Mr. Clay as a manager in order to avoid conflicts. 331 Partners and C-D Jones also modified the Lot Sales and Houses Notes to add Bill Clay as a guarantor and to remove Dennis and Cynthia Jones as guarantors. On December 29, 2006, C-D Jones and 331 Partners amended the Lot Sales Note to extend the maturity date from December 31, 2006, to January 31, 2007. The parties also amended the Houses Note to extend the maturity date of the interest payment from December 31, 2006, to January 31, 2007.

On March 23, 2007, Bill Clay purchased the remaining shares of C-D Jones from Chris Jones and became the sole shareholder of C-D Jones. As a part of the share sale agreement, C-D Jones was to deliver to Chris Jones seven unencumbered lots in Villa Lago and $250,000.00. On April 3, 2007, C-D Jones, Chris Jones, Bill Clay, and 331 Partners executed the agreement in which C-D Jones conveyed seven Villa Lago lots to Chris Jones, free of 331 Partners' mortgage, as well as $250,000.00 which was labeled a "restructuring fee." That agreement states that 331 Partners released the lots to C-D Jones pursuant to a "Settlement Agreement" incorporated by reference. In the same document Chris Jones conveyed his interest in Stonegate, LLC, to Genoa Development, LLC; he resigned as managing member of Mack Bayou, LLC; he conveyed half of his interest in TRDH, LLC, to Bill Clay with the agreement that TRDH, LLC, would execute and deliver a lease to CD Jones; and he conveyed his interest in The Boardwalk at 30-A, LLC, to W. Clay Properties, LLC.

On the same day, 331 Partners and C-D Jones amended the Lot Sales Note to release Chris Jones as a guarantor and increased the amount of net sales proceeds paid to 331 Partners

4

from lot sales to 100%. McGowin Patrick testified that this benefited 331 Partners because it significantly increased the amount the company would be paid. The parties also amended the Houses Note to remove Chris Jones as a guarantor, to extend the maturity date from December 31, 2009, to December 31, 2010, and to alter the housing progress payments listed in Schedule I of the amendment by increasing the payment to 331 Partners from house sales. Additionally, 331 Partners and C-D Jones executed a Collateral Assignment Modification Agreement. After the transactions on April 3, 2007, 331 Partners retained thirty-seven lots.

During this time period C-D Jones also had contracts for other construction projects in the Genoa and Sacred Oaks subdivisions, and Boardwalk at 30-A, as well as for the construction of custom homes in addition to its project with 331 Partners. Bill Clay testified that during this time the market began to fail and construction substantially slowed on all projects, including Villa Lago.

Then, in May of 2007, C-D Jones, Tracey Clay, Clay & Co., and William Clay were sued regarding the Villa Lago development in a dispute known as the "Alcan Litigation." The plaintiffs in that case alleged violations of the interstate Land Sales Disclosure Act, fraudulent misrepresentation, fraudulent suppression, fraudulent inducement, and several contract claims among other things. 331 Partners was added as a defendant in that case in February of 2008. The Daakes were not a party to that litigation.

On February 1, 2008, 331 Partners declared C-D Jones in default for failure to pay under the Lot Sales and Houses Notes. Following the default, C-D Jones sole shareholder Bill Clay negotiated with IPC manager McGowin Patrick and on April 30, 2009, C-D Jones and 331 Partners executed a Loan Workout Agreement in which (1) C-D Jones agreed to complete unfinished amenities at Villa Lago (including landscaping, pool, and clubhouse) by August 10,

2009, (2) C-D Jones conveyed all remaining lots to 331 Partners in lieu of foreclosure, (3) third party litigation was settled, (4) 331 Partners agreed to allow C-D Jones to release settling plaintiffs in other litigation, (5) 331 Partners and C-D Jones agreed to mutual releases, and (6) C-D Jones agreed that it would not file a bankruptcy proceeding and in the event it did, the automatic stay would not apply to 331 Partners with regard to assets under the Lot Sales and Houses Notes.

After the execution of the Loan Workout Agreement, C-D Jones failed to meet its obligation to complete the Villa Lago amenities. The Villa Lago Homeowners Association completed the unfinished amenities and 331 Partners repaid the HOA for the cost of completing the work.

On July 30, 2009, C-D Jones filed a voluntary chapter 11 bankruptcy petition in the Northern District of Florida. In its schedules it listed 331 Partners as a secured creditor with a contract claim for unbuilt homes and a first mortgage on thirty-seven vacant lots. 331 Partners obtained relief from the automatic stay as to assets under the Lot Sales and Houses Notes. C-D Jones' schedules also listed the Daakes as unsecured judgment creditors.

The Daakes' judgment against C-D Jones originated in January of 2004 when the Daakes sued C-D Jones on breach of contract, building code violation, and fraud claims in Walton County, Florida, Circuit Court. The Daakes had a home construction contract with C-D Jones as to property unrelated to the Villa Lago project, and the Daakes contract with C-D Jones predated the existence of 331 Partners. The Daakes' claims against C-D Jones and its co-defendant, A.F.A.B. Contractors, Inc., were tried by jury from June 22, 2009, through July 2, 2009. The jury returned a verdict in favor of the Daakes and awarded them a total judgment of

$5,196,707.67 (with a statutory interest rate of 8%). The Daakes filed a proof of claim in the C-D Jones Bankruptcy on October 20, 2009 in the amount of $6,127,273.01.

On January 26, 2010, a jury returned a $1,625,538.44 judgment in favor of the plaintiffs in the Alcan litigation. 331 Partners filed its own voluntary chapter 11 petition on February 27, 2010. Russel Myles, one of the Alcan litigation plaintiffs, filed an adversary proceeding against 331 Partners on June 7, 2010 objecting to discharge under 11 U.S.C. § 523(a)(2)(A) and § 727(a)(4) and/or 11 U.S.C. § 1141. The Daakes filed a proof of claim in 331 Partners' bankruptcy on August 18, 2010. Attached to their proof of claim was the final judgment they received in Walton County, Florida, against CD Jones. On October 14, 2010, the Daakes amended that claim to $6,333,453.73 to include attorneys' fees, costs, and post judgment interest. On August 31, 2010, 331 Partners filed an objection to the Daakes' claim.

Initially, 331 Partners objected to the Daakes' claim on the grounds that the Daakes' claim alleges a judgment-alter ego, that the Daakes' judgment is not against the Debtor, and that the Daakes' debt was not listed in the Debtor's schedules and has no factual foundation. On September 10, 2010, the Daakes filed an Emergency Motion to Allow Claim (claim #41), arguing that 331 partners is an alter ego of and a joint venture partner with C-D Jones, and is therefore liable for their claim. This Court held a hearing on the claim objection on October 18, 2010, and took this matter under advisement.[1]

---

[1] At the hearing on October 18, 2010, the Daakes requested additional time to continue attempts to serve a subpoena on Chris Jones. The Court granted the Daakes' request and gave them until Monday, November 1, 2010 to complete service on Mr. Jones. The Court also stated that in the event that the record was supplemented with Chris Jones' deposition, the parties would be permitted to submit short briefs discussing the supplemental evidence. Mr. Jones was not served on or before November 1, 2010, therefore the record remains closed without supplemental evidence and no further briefs will be considered. The Daakes submitted a Post-Trial Memorandum on November 1, 2010. That brief has not taken it into account in issuing this decision, however, even if the Court had given weight to the Daakes' post-trial brief, it would not have changed the outcome of the Court's analysis of the facts and law presented.

LAW

In an Objection to Claim the debtor must initially provide evidence that is at least equal to the evidence put forth by the creditor in its proof of claim. Once that evidence has been provided the burden shifts to the creditor to prove its case by a preponderance of the evidence. Additionally, where the underlying facts of a case are complicated – such as in the case at hand - it is appropriate to require a creditor to present its case first at trial and to bear the burden of proving its claim by a preponderance of the evidence. *In re Winn-Dixie Stores, Inc.*, 418 B.R. 475 (Bankr. M.D. Fla. 2009).

The Daakes seek to hold 331 Partners liable for their judgment against C-D Jones. In their Response to Debtor's Objection to Claim they argue that 331 Partners is an alter ego of and joint venturer with C-D Jones. In their Supplemental Response in Opposition to Objection to Claim #41 and at hearing on October 18, 2010, the Daakes argued that 331 Partners is liable on the basis of successor liability. Because the Daakes appear to have relied more heavily on their successor liability argument, the Court will primarily address it. Further, because the law in both states on these issues is nearly identical, the Court need not reach the issue of whether Alabama or Florida law is controlling.

A. Successor Liability

A majority of states, including Florida and Alabama, follow the "traditional corporate law rule" which holds that in the absence of fraud, the mere transfer of assets from one corporation to another is not sufficient to make the second corporation liable for the debts of the first. But, a successor may be responsible for the predecessor's debts where:

(1) The successor expressly or impliedly assumes obligations of the predecessor,

(2) The transaction is a de facto merger,

(3) The successor is a mere continuation of the predecessor, or

(4) The transaction is a fraudulent effort to avoid the liabilities of the predecessor.

*Amjad Munim, M.D., P.A. v. Azar M.D.*, 648 So.2d 145 (Fla. Dist. Ct. App. 1994) (*citing Bernard v. Kee Mfg. Co.*, 409 So.2d 1047, 1049 (Fla. 1982)). The test of whether a successor should be liable for the acts of the predecessor is a fact specific inquiry and must be conducted in light of the facts of each case and the particular legal obligation that is at issue. *Desporte-Bryan v. Bank of America*, 147 F.Supp.2d 1356, 1362-63 (S.D. Fla. 2001). Imposing liability on a successor corporation for the predecessor's debts is based on the notion that a corporation should not be able to avoid liability through transforming its corporate form. *Laboratory Corp. of America v. Professional Recovery Network, et al.*, 813 So.2d 266 (Fla. Dist. Ct. App. 2002).

First, the Daakes argue that, when 331 Partners decided to fund completion of the Villa Lago amenities, they became liable as successors to C-D Jones by assuming the obligations of C-D Jones. However, 331 Partners' action in completing the amenities does not constitute an express or implied assumption of the obligations of the predecessor corporation in the sense that case law describes. By way of example, courts have found successor liability where the parties have executed an assumption of liability agreement. *See Turner v. Wean United, Inc.*, 531 So.2d 827 (Ala. 1988). No such agreement exists in this case. Here it appears that the actions of 331 Partners in ensuring the completion of the amenities was directly connected to the preservation and/or improvement of the value of Villa Lago lots 331 Partners owned. Since the second reason is as likely as the first, the Daakes have not proven their case by a preponderance of the evidence. Under the facts presented in this case, that alone is not enough to impose successor liability on the grounds of express or implied assumption.

9

Second, the Daakes argue that there has been a de facto merger between 331 Partners and C-D Jones. A de factor merger occurs where one corporation is absorbed by another without formal compliance with the statutory requirements for a merger. *Lab. Corp. of America.*, 813 So.2d at 270. "To determine if a de factor merger has occurred, the finder of fact may look at any factors reasonably indicative of commonality or of distinctiveness." *Id*. The significant question is whether there has been a change in form, but not in substance. *Id*. In this case, there does not appear to have ever been a consolidation of 331 Partners and C-D Jones that would fit within the definition of a de facto merger. 331 Partners did not consolidate offices with C-D Jones, it did not share staff with C-D Jones, and it did not share any assets with C-D Jones other than the real estate that was the basis of the relationship between the two entities. The only other common element between 331 Partners and C-D Jones was Bill Clay, but even that connection was limited as much as possible when 331 Partners amended its operating agreement to remove Clay as a manager. The mere fact that there is some common ownership in a successor entity and predecessor entity is not grounds for imposing successor liability. *See Turner,* 531 So.2d 827.

Third, the Daakes argue that 331 Partners is liable for C-D Jones' debts because 331 Partners is a continuation of C-D Jones. A successor is considered to be a continuation of the predecessor where the successor is really a reincarnation of the predecessor under a different name. *Lab. Corp. of America*, 813 So.2d at 270. "While having common attributes does not automatically impose liability on a successor corporation, merely repainting the sign on the door and using new letterhead certainly gives the appearance that the new corporation is simply a continuation of the predecessor corporation." *Id*. The indices of a continuation are, at a minimum, continuity of directors, officers, and stockholders, and the continued existence of only

10

one corporation after the sale of assets. *Milliken & Co. v. Duro Textiles, LLC*, 887 N.E. 2d 244 (Mass. 2008). In this case, the minimum indices of continuation are not met. There is no continuity of directors or officers, and although there is a common stockholder between the two companies, that alone is not enough to suggest that 331 Partners is a reincarnation of C-D Jones. Further, C-D Jones continued to operate as its own company until it sought relief under Chapter 7 in July of 2009, over two years after Bill Clay became the sole shareholder of C-D Jones.

Fourth, the Daakes argue that 331 Partners and C-D Jones engaged in fraudulent transactions in order to allow C-D Jones to avoid its liabilities. The presence of fraud is to be determined by the particular facts surrounding each specific conveyance. *Orlando Light Bulb Service, Inc. v. Laser Lighting & Electrical Supply, Inc.*, 523 So.2d 740, 744 (Fla. Dist. Ct. App. 1988). As was evident from the testimony given at the hearing, each transaction that occurred between 331 Partners and C-D Jones was accompanied by fair consideration. There does not appear to be any fraudulent attempt to escape liability in this case. The sales price of the lots paid by C-D Jones was not clearly unfair. In fact, ninety-four lots of Villa Lago were sold at values that supported the sales price. The Daakes cannot use hindsight to prove that the value was too high. Ninety-four lots sold precludes a finding of fraud in the pricing. The Daakes also argued that 331 Partners structuring of the transaction was a tax scheme, done to obtain maximum tax benefits for 331 Partners and without regards to true corporate needs or principles. However, the tax returns in evidence were prepared by a CPA and there was no proof offered that the transactions were ever questioned. Structuring real estate deals for maximum tax advantage is not improper.

Overall, the Daakes failed to prove that 331 Partners expressly or impliedly assumed the obligations of C-D Jones, that there was a de facto merger, that 331 Partners was a mere

11

continuation of C-D Jones, or that the transactions between C-D Jones and 331 Partners were a fraudulent attempt to avoid liability. Because none of these elements have been proven, 331 Partners is not liable for the debts of C-D Jones on the basis of successor liability.

A. Alter Ego / Joint Venture

A finding that 331 Partners was the alter ego of C-D Jones would entail a piercing of the corporate veil which requires: (1) the shareholder dominated and controlled the corporation to such an extent that the corporation did not have its own independent existence, (2) the corporate form must have been used fraudulently or improperly, (3) the fraudulent or improper use of the corporate form must have caused the injury to the claimant. *In re Hillsborough Holdings Corp.*, 166 B.R. 461 (Bankr. M.D. Fla. 1994). While 331 Partners and C-D Jones were engaged in a lender-borrower relationship, and they did share a common owner, there is no evidence that 331 Partners controlled and dominated C-D Jones, or vice versa. C-D Jones operated completely separately, doing business involving other real estate, such as with the Daakes. There was no evidence that 331 Partners knew about the extent of C-D Jones' other business. Further, the evidence shows that 331 Partners maintained a proper corporate form and did not use its corporate form to cause injury to the Daakes. 331 Partners acted as a lender to C-D Jones, and nothing more. The evidence of record does not support a finding that 331 Partners was the alter ego of C-D Jones.

A joint venture is a legal relationship similar to a partnership, but is more limited in scope. *Kislak v. Kreedian*, 95 So.2d 510, 514-15 (Fla. 1957). It is created where two or more persons combine property, time, or a combination of the two to conduct a particular line of trade or for a particular business deal. *Id*. "In order to create a joint venture, a contract must contain

12

Case 10-00846   Doc 267   Filed 11/09/10   Entered 11/09/10 11:47:18   Desc Main
Document      Page 12 of 13

the following elements: (1) a community interest in the performance of the common purpose, (2) joint control or right of control, (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits and (5) a duty to share in any losses which may be sustained." *Jackson-Shaw Co. v. Jacksonville Aviation Authority*, 8 So.3d 1076 (Fla. 2008). In this case, there is no contract between 331 Partners and C-D Jones to engage in a joint venture, there is no joint right of control, no right to share in the profits, and no duty to share in any losses. The evidence shows that 331 Partners and C-D Jones had a structured loan repayment plan that, although based on lot sales, did not constitute loss or profit sharing. In fact, C-D Jones and 331 Partners considered a joint venture when they debated the Boardwalk at Baytowne deal, and rejected it. There is not enough evidence to support a finding that 331 Partners and C-D Jones engaged in a joint venture.

The evidence of record does not support a finding that 331 Partners should be liable for the debts of C-D Jones on the basis of successor liability, alter ego, or joint venture. For these reasons, 331 Partners should not be held liable for the Daakes' judgment against C-D Jones and the Debtor's Objection to Claim is due to be SUSTAINED.

Dated: November 9, 2010

                                                /s/ Margaret A. Mahoney
MARGARET A. MAHONEY
CHIEF U.S. BANKRUPTCY JUDGE